COPY

1  LATHAM & WATKINS LLP
     David A. York
2  135 Commonwealth Drive
   Menlo Park, California 94025
3  Telephone: (650) 328-4600
   Facsimile: (650) 463-2600
4
     Steven M. Bauer
5  505 Montgomery Street – Suite 1800
   San Francisco, California 94111
6  Telephone: (415) 391-0600
   Facsimile: (415) 395-8095
7
   Attorneys for Petitioners
8  SANFORD STRATEGIC INVESTMENT FUND
   LLC;  PRESIDIO GROWTH LLC (Tax Matters
9  Partner)

10                    UNITED STATES DISTRICT COURT

11                  NORTHERN DISTRICT OF CALIFORNIA

12                      SAN FRANCISCO DIVISION

13

14
   SANFORD STRATEGIC INVESTMENT
15 FUND LLC; and PRESIDIO GROWTH LLC
   (Tax Matters Partner),
16                                            CASE NO.
                Petitioners,
17                                            PETITION FOR READJUSTMENT OF
        v.                                    PARTNERSHIP ITEMS UNDER INTERNAL
18                                            REVENUE CODE SECTION 6226
   UNITED STATES OF AMERICA,
19
                Respondent.
20

21

22        Sanford Strategic Investment Fund, LLC ("SSIF") and Presidio Growth, LLC ("Presidio

23 Growth"), the tax matters partner of SSIF, for their Petition against the United States of America,

24 allege as follows:

25                       PRELIMINARY STATEMENT

26        1.      In July 2004, the Oakland, California Office of the Internal Revenue Service

27 mailed to Presidio Growth, LLC ("Presidio Growth"), the tax matters partner of an investment

28 fund called Sanford Strategic Investment Fund, LLC ("SSIF"), a Notice of Final Partnership

1    Administrative Adjustment ("FFPA").  In the FPAA, the IRS set forth a large number of

2    erroneous partnership administrative adjustments for SSIF's taxable year ended December 22,

3    1999 and asserted that SSIF was liable for significant penalties as well.  The IRS justified its

4    adjustments and claims for penalties with repetitive conclusory statements to the effect that SSIF

5    was a sham, SSIF had no economic purpose, the partnership should be completely disregarded,

6    premium loans made by Deutsche Bank to five of SSIF's members and then assigned to SSIF

7    should be recast as floating rate loans (with no premium) made to SSIF, SSIF's accounting

8    should be disregarded, and so on.  Substantively, the FPAA is woefully deficient in its

9    conclusions, but it is even more deficient in its rationale.  The IRS did not make even the

10   slightest attempt to explain *why* SSIF was a sham, or *why* the premium loan should be so

11   cavalierly disregarded.    The FPAA is, in short, nothing more than argument by assertion.  The

12   fact of the matter is that Exhibits C - E hereto, which include a detailed explanation of the

13   investment plan and two lengthy and careful opinions from the well-regarded law firm of Brown

14   & Wood and the KPMG accounting firm, demonstrate very well that as of the time this tax return

15   was filed, any reasonable person could conclude that SSIF was a not sham, the premium loans

16   were legitimate, and the 1999 tax return filed by SSIF was legitimate as well.

17                                                    PARTIES

18          2.       SSIF was organized as a limited liability company under the laws of the State of

19   Delaware in September 1999.  SSIF had seven members:  Presidio Growth, Presidio Resources

20   LLC ("Presidio Resources"), Humptulips Ventures, LLC ("Humptulips"), Satsop Ventures, LLC

21   ("Satsop"), Wynoochee Ventures, LLC ("Wynoochee"), Chehalis Ventures, LLC ("Chehalis"),

22   and Newaukum Ventures, LLC ("Newaukum").  SSIF's partnership identifying number was 94-

23   3340970, and until January 26, 2000, when a Certificate of Cancellation was filed with the

24   Delaware Division of Corporations, its principal place of business was 333 Hayes Street – Suite

25   200, San Francisco, California 94102.  On October 4, 2004 a Certificate of Correction was filed

26   with the Delaware Division of Corporations and was certified by the Delaware Secretary of

27   State.  The Certificate of Correction had the effect of reversing the cancellation of SSIF.  The

28   principal place of business of SSIF at the time of filing this Petition is 11451 Katy Freeway --

LATHAM&WATKINS
ATTORNEYS AT LAW
SILICON VALLEY

2

PETITION FOR READJUSTMENT OF
PARTNERSHIP ITEMS UNDER INTERNAL
REVENUE CODE SECTION 6226

1  Suite 510, Houston, Texas 77079. The SSIF tax return for the year ended December 22, 1999,
2  that which is at issue here, was filed with the Internal Revenue Service Center at Fresno,
3  California.

4     3.     Presidio Growth is a limited liability company organized under the laws of the
5  State of Delaware in 1999. Presidio Growth's taxpayer identifying number is 94-3335604, and
6  Presidio Growth currently has its principal place of business at 1451 Katy Freeway, Suite 510,
7  Houston, Texas 77079-2005. Presidio Growth was, during the periods relevant hereto, the
8  managing member and tax matters partner of SSIF.

9     4.     Respondent is the United States of America.

10                           JURISDICTION AND VENUE

11    5.     Respondent, through the Oakland, California Office of the Internal Revenue
12  Service (an agency of the Department of the Treasury), mailed to Presidio Growth, the tax
13  matters partner of SSIF, a Notice of Final Partnership Administrative Adjustment dated July 19,
14  2004, setting forth various erroneous partnership administrative adjustments for SSIF's taxable
15  year ended December 22, 1999 ("FPAA"). A copy of the FPAA is attached hereto as Exhibit A.

16    6.     Petitioners contest each and every adjustment of the FPAA and the conclusory
17  and erroneous rationales employed by Respondent to reach such adjustments.

18    7.     This Court has jurisdiction over this petition pursuant to 28 U.S.C. § 1346(e) and
19  26 U.S.C. § 6226(a)(2).

20    8.     Petitioners inform the Court they believe that jurisdiction and venue is appropriate
21  in the United States District Court - Houston Division under 28 U.S.C. 1402(a)(1) and 26 U.S.C.
22  § 6226(a)(2) because the current address of SSIF and Presidio Growth is in Houston, Texas. To
23  the extent there is any doubt that the Houston location qualifies as SSIF's principal place of
24  business as of the date of this Petition, Petitioners have filed this Petition in this Court because
25  SSIF's principal place of business was in San Francisco during the time it was engaged in the
26  investment activities that are the subject matter of the FPAA.

27    9.     Pursuant to 26 U.S.C. § 6226(e)(1), prior to the filing of this Petition, Presidio
28  Growth deposited with the Internal Revenue Service the total amount of $109,000, representing

1  the amount by which the tax liability of Presidio Growth would be increased if the treatment of

2  the "partnership items" on Presidio Growth's tax return were made consistent with the

3  adjustments made in the FPAA. Attached as Exhibit B is a copy of the paper work and check

4  associated with this deposit.

5  <div align="center">SUMMARY OF FPAA CONCLUSIONS</div>

6      10.   Distributive Share Items: Net Short-term Capital Gain (Loss). In the FPAA, the

7  Internal Revenue Service adjusted SSIF's reported short-term capital loss of $169,200 resulting

8  from foreign currency trading activities to reflect, instead, a $0 short-term capital gain (loss). It

9  did so by concluding:

10          (a) SSIF was a sham, the transactions in which SSIF and its members engaged

11      lacked economic substance, and the principal purpose of SSIF was to reduce the various

12      partners' federal tax liabilities;

13          (b) SSIF should be disregarded as an entity, and the assets and activities of SSIF

14      should be deemed those of the partners;

15          (c) Presidio Growth, Presidio Resources, Humptulips, Satsop, Wynoochee,

16      Chehalis, and Newaukum should not have been treated as partners of SSIF;

17          (d) The methods of accounting used by SSIF and its partners should be adjusted

18      so that the capital gains and losses of SSIF be deemed those of the various partners; and

19          (e) SSIF is not entitled to a deduction for a certain Interest Rate Swaption.

20  In fact, as Petitioners conclusively demonstrate in paragraphs below and in the attached Exhibits

21  C – E, the fundamental premises to all the conclusions of the Internal Revenue Service (i.e., that

22  SSIF was a sham and that its activities lacked economic substance), are demonstrably incorrect.

23      11.   Distributive Share Items: Other Income (Loss). In the FPAA, the Internal

24  Revenue Service adjusted SSIF's reported "Other Income" loss of $1,199,855 resulting from

25  foreign currency trading activities to reflect, instead, a $0 loss. It did so by concluding:

26          (a) SSIF was a sham, the transactions in which SSIF and its members engaged

27      lacked economic substance, and the principal purpose of SSIF was to reduce the various

28      partners' federal tax liabilities;

LATHAM•WATKINS<sub>LLP</sub>
ATTORNEYS AT LAW
SILICON VALLEY

4

PETITION FOR READJUSTMENT OF
PARTNERSHIP ITEMS UNDER INTERNAL
REVENUE CODE SECTION 6226

1            (b)  SSIF should be disregarded as an entity, and the assets and activities of SSIF

2    should be deemed those of the partners;

3            (c)  Presidio Growth, Presidio Resources, Humptulips, Satsop, Wynoochee,

4    Chehalis, and Newaukum should not have been treated as partners of SSIF;

5            (d)  The methods of accounting used by SSIF and its partners should be adjusted

6    so that the capital gains and losses of SSIF be deemed those of the various partners; and

7            (e)  Alternatively, SSIF is not entitled to a loss because the loss did not meet the

8    requirements of 26 U.S.C. § 165 or any other Code section.

9        In fact, as Petitioners conclusively demonstrate in paragraphs below and in the attached

10   Exhibits C – E, the fundamental premises to all the conclusions of the Internal Revenue Service

11   (*i.e.*, that SSIF was a sham and that its activities lacked economic substance), are demonstrably

12   incorrect.

13       12.    <u>Distributive Share Items:  Other Deductions</u>.  In the FPAA, the Internal Revenue

14   Service adjusted certain of SSIF's reported deductions attributable to management fees, loan

15   fees, and other deductions from a total of $6,973,763 to a total of $0.  It did so by concluding:

16           (a)  SSIF was a sham, the transactions in which SSIF and its members engaged

17   lacked economic substance, and the principal purpose of SSIF was to reduce the various

18   partners' federal tax liabilities;

19           (b)  SSIF should be disregarded as an entity and the assets and activities of SSIF

20   should be deemed those of the partners;

21           (c)  Presidio Growth, Presidio Resources, Humptulips, Satsop, Wynoochee,

22   Chehalis, and Newaukum should not have been treated as partners of SSIF;

23           (d)  The methods of accounting used by SSIF and its partners should be adjusted

24   so that the expenses of SSIF be deemed those of the various partners and, even if the

25   expenses deducted by SSIF were deemed expended by SSIF, they were not allowable

26   deductions under 26 U.S.C. §§ 162, 164, 165, 183, 707, or any other Code section.

27   In fact, as Petitioners conclusively demonstrate in paragraphs below and in the attached Exhibits

28   C – E, the fundamental premises to all the conclusions of the Internal Revenue Service (*i.e.*, that

LATHAM&WATKINS ᴸᴾ
ATTORNEYS AT LAW
SILICON VALLEY

5

PETITION FOR READJUSTMENT OF
PARTNERSHIP ITEMS UNDER INTERNAL
REVENUE CODE SECTION 6226

1  SSIF was a sham and that its activities lacked economic substance), are demonstrably incorrect.

2     13.   <u>Distributive Share Items:  Interest Expense on Investment Debt</u>.  In the FPAA, the

3  Internal Revenue Service adjusted certain of SSIF's reported deductions attributable to

4  investment debt from a total of $6,139,483 to a total of $0.  It did so by concluding:

5         (a)  SSIF was a sham, the transactions in which SSIF and its members engaged

6         lacked economic substance, and the principal purpose of SSIF was to reduce the various

7         partners' federal tax liabilities;

8         (b)  SSIF should be disregarded as an entity and the assets and activities of SSIF

9         should be deemed those of the partners;

10         (c)  Presidio Growth, Presidio Resources, Humptulips, Satsop, Wynoochee,

11         Chehalis, and Newaukum should not have been treated as partners of SSIF;

12         (d)  The methods of accounting used by SSIF and its partners should be adjusted

13         so that the expenses of SSIF be deemed those of the various partners; and

14         (e)  Even if the expenses deducted by SSIF were deemed expended by SSIF, they

15         were not allowable deductions under 26 U.S.C. § 163, or any other Code section.

16  In fact, as Petitioners conclusively demonstrate in paragraphs below and in the attached Exhibits

17  C – E, the fundamental premises to all the conclusions of the Internal Revenue Service (*i.e.*, that

18  SSIF was a sham and that its activities lacked economic substance), are demonstrably incorrect.

19     14.   <u>Distributive Share Items:  Distribution of Money</u>.  In the FPAA, the Internal

20  Revenue Service adjusted SSIF's reported distributions of money to its partners from a total of

21  $5,621,064 to a total of $0.  It did so by concluding:

22         (a)  The $501,300,000 in cash contributed to SSIF by partners Humptulips,

23         Satsop, Wynoochee, Chehalis, and Newaukum was not, in fact, proceeds from premium

24         loans from Deutsche Bank to Humptulips, Satsop, Wynoochee, Chehalis, and Newaukum

25         (disregarding the Deutsche Bank loans to Humptulips, Satsop, Wynoochee, Chehalis, and

26         Newaukum entirely and deeming the $501,300,000 as borrowed by SSIF from Deutsche

27         Bank);

28         (b)  In the event the loans from Deutsche Bank to Humptulips, Satsop,

LATHAM&WATKINS™
ATTORNEYS AT LAW
SILICON VALLEY

6

PETITION FOR READJUSTMENT OF
PARTNERSHIP ITEMS UNDER INTERNAL
REVENUE CODE SECTION 6226

1    Wynoochee, Chehalis, and Newaukum are deemed to exist, the premium nature of the

2    loans should be disregarded, Humptulips, Satsop, Wynoochee, Chehalis, and

3    Newaukum's total obligation of repayment to Deutsche Bank should be deemed to be in

4    the amount of $501,300,000, and SSIF's assumption of the liability of the Humptulips,

5    Satsop, Wynoochee, Chehalis, and Newaukum notes should be deemed to be in the

6    amount of $501,300,000;

7          (c)  The total amount of the cash proceeds from the Deutsche Bank premium

8    loans should be integrated with a subsequent interest rate swap made by SSIF to create a

9    "synthetic debt instrument" such that the total principal amount of the notes assumed by

10    SSIF from Humptulips, Satsop, Wynoochee, Chehalis, and Newaukum be deemed

11    $501,300,000;

12          (d)  In the event the premium nature of the loans is respected under Internal

13    Revenue Code Section 752, the premium nature of the loans should be disregarded under

14    a temporary provision of the Treasury Regulations, and SSIF's assumption of the liability

15    of the Humptulips, Satsop, Wynoochee, Chehalis, and Newaukum notes should be

16    deemed to be in the amount of $501,300,000;

17          (e)  SSIF was a sham, the transactions in which SSIF and its members engaged

18    lacked economic substance, and the principal purpose of SSIF was to reduce the various

19    partners' federal tax liabilities;

20          (f)  SSIF should be disregarded as an entity, and the assets and activities of SSIF

21    should be deemed those of the partners;

22          (g)  Presidio Growth, Presidio Resources, Humptulips, Satsop, Wynoochee,

23    Chehalis, and Newaukum should not have been treated as partners of SSIF; and

24          (h)  The methods of accounting used by SSIF and its partners should be adjusted

25    so that the cash distributions of SSIF be deemed not to have been made.

26    In fact, as Petitioners conclusively demonstrate in paragraphs below and in the attached Exhibits

27    C – E, the fundamental premises to these conclusions of the Internal Revenue Service (*i.e.*, that

28    the true nature of the premium loans made to Humptulips, Satsop, Wynoochee, Chehalis, and

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SILICON VALLEY

7

PETITION FOR READJUSTMENT OF
PARTNERSHIP ITEMS UNDER INTERNAL
REVENUE CODE SECTION 6226

1 Newaukum should be disregarded, that SSIF was a sham and that its activities lacked economic

2 substance), are demonstrably incorrect.

3     15.   Status of Premium as Liability. In the FPAA, the Internal Revenue Service

4 adjusted SSIF's Partnership Liabilities upward in the amount of $188,000,000. It did so by

5 concluding:

6     (a) The $501,300,000 in cash contributed to SSIF by partners Humptulips,

7 Satsop, Wynoochee, Chehalis, and Newaukum was not, in fact, proceeds from premium

8 loans from Deutsche Bank to Humptulips, Satsop, Wynoochee, Chehalis, and Newaukum

9 (disregarding the Deutsche Bank loans to Humptulips, Satsop, Wynoochee, Chehalis, and

10 Newaukum entirely and deeming the $501,300,000 as borrowed by SSIF from Deutsche

11 Bank);

12     (b) In the event the loans from Deutsche Bank to Humptulips, Satsop,

13 Wynoochee, Chehalis, and Newaukum are deemed to exist, the premium nature of the

14 loans should be disregarded, Humptulips, Satsop, Wynoochee, Chehalis, and

15 Newaukum's total obligation of repayment to Deutsche Bank should be deemed to be in

16 the amount of $501,300,000, and SSIF's assumption of the liability of the Humptulips,

17 Satsop, Wynoochee, Chehalis, and Newaukum notes should be deemed to be in the

18 amount of $501,300,000;

19     (c) The total amount of the cash proceeds from the Deutsche Bank premium

20 loans should be integrated with a subsequent interest rate swap made by SSIF to create a

21 "synthetic debt instrument" such that the total principal amount of the notes assumed by

22 SSIF from Humptulips, Satsop, Wynoochee, Chehalis, and Newaukum be deemed to be

23 $501,300,000;

24     (d) In the event the premium nature of the loans is respected under Internal

25 Revenue Code Section 752, the premium nature of the loans should be disregarded under

26 a temporary provision of the Treasury Regulations, and SSIF's assumption of the liability

27 of the Humptulips, Satsop, Wynoochee, Chehalis, and Newaukum notes should be

28 deemed to be in the amount of $501,300,000;

1        (e) SSIF was a sham, the transactions in which SSIF and its members engaged

2    lacked economic substance, and the principal purpose of SSIF was to reduce the various

3    partners' federal tax liabilities;

4        (f) SSIF should be disregarded as an entity, and the assets and activities of SSIF

5    should be deemed those of the partners;

6        (g) Presidio Growth, Presidio Resources, Humptulips, Satsop, Wynoochee,

7    Chehalis, and Newaukum should not have been treated as partners of SSIF;

8        (h) The methods of accounting used by SSIF and its partners should be adjusted

9    so that the claimed increase in the partners' outside basis attributable to the premiums

10   from the Deutsche Bank loans contributed to SSIF be disallowed; and

11       (i) In the event SSIF is determined not to be a sham, the premium nature of the

12   loans should be disregarded, and SSIF's assumption of the liability of the Humptulips,

13   Satsop, Wynoochee, Chehalis, and Newaukum notes should be deemed to be in the

14   amount of $501,300,000.

15   In fact, as Petitioners conclusively demonstrate in paragraphs below and in the attached Exhibits

16   C – E, the fundamental premises to these conclusions of the Internal Revenue Service (*i.e.*, that

17   the true nature of the premium loans made to Humptulips, Satsop, Wynoochee, Chehalis, and

18   Newaukum should be disregarded, that SSIF was a sham and that its activities lacked economic

19   substance), are demonstrably incorrect.

20       16.    Capital Contributions.   In the FPAA, the Internal Revenue Service adjusted

21   SSIF's reported capital contributions of its partners from $15,359,608 to $0.  It did so by

22   concluding:

23       (a) In the event the loans from Deutsche Bank to Humptulips, Satsop,

24   Wynoochee, Chehalis, and Newaukum are deemed to exist, the premium nature of the

25   loans should be disregarded, Humptulips, Satsop, Wynoochee, Chehalis, and

26   Newaukum's total obligation of repayment to Deutsche Bank should be deemed to be in

27   the amount of $501,300,000, and SSIF's assumption of the liability of the Humptulips,

28   Satsop, Wynoochee, Chehalis, and Newaukum notes should be deemed to be in the

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SILICON VALLEY

9

PETITION FOR READJUSTMENT OF
PARTNERSHIP ITEMS UNDER INTERNAL
REVENUE CODE SECTION 6226

1    amount of $501,300,000;

2        (b)  The total amount of the cash proceeds from the Deutsche Bank premium

3    loans should be integrated with a subsequent interest rate swap made by SSIF to create a

4    "synthetic debt instrument" such that the total principal amount of the notes assumed by

5    SSIF from Humptulips, Satsop, Wynoochee, Chehalis, and Newaukum be deemed to be

6    $501,300,000;

7        (c)  In the event the premium nature of the loans is respected under Internal

8    Revenue Code Section 752, the premium nature of the loans should be disregarded under

9    a temporary provision of the Treasury Regulations, and SSIF's assumption of the liability

10    of the Humptulips, Satsop, Wynoochee, Chehalis, and Newaukum notes should be

11    deemed to be in the amount of $501,300,000;

12        (d)  SSIF was a sham, the transactions in which SSIF and its members engaged

13    lacked economic substance, and the principal purpose of SSIF was to reduce the various

14    partners' federal tax liabilities;

15        (e)  SSIF should be disregarded as an entity, and the assets and activities of SSIF

16    should be deemed those of the partners;

17        (f)  Presidio Growth, Presidio Resources, Humptulips, Satsop, Wynoochee,

18    Chehalis, and Newaukum should not have been treated as partners of SSIF;

19        (g)  The methods of accounting used by SSIF and its partners should be adjusted;

20    and

21        (h)  The partners of SSIF should be deemed to have failed to establish the basis of

22    any capital contributed to SSIF.

23    In fact, as Petitioners conclusively demonstrate in paragraphs below and in the attached Exhibits

24    C – E, the fundamental premises to these conclusions of the Internal Revenue Service (*i.e.*, that

25    the true nature of the premium loans made to Humptulips, Satsop, Wynoochee, Chehalis, and

26    Newaukum should be disregarded, that SSIF was a sham and that its activities lacked economic

27    substance), are demonstrably incorrect.

28

LATHAM•WATKINS
ATTORNEYS AT LAW
SILICON VALLEY

10

PETITION FOR READJUSTMENT OF
PARTNERSHIP ITEMS UNDER INTERNAL
REVENUE CODE SECTION 6226

1       17.    <u>Memorandum Items:  Distributive Shares and Allocations</u>.  In the FPAA, the

2 Internal Revenue Service concluded that the distributive shares and allocations of the SSIF

3 partners should either be ignored (for all the reasons set forth in the preceding paragraphs) or,

4 alternatively, reallocated such that each of the seven partners of SSIF is deemed to have a one-

5 seventh interest in the shares and allocations of SSIF.  In fact, as Petitioners conclusively

6 demonstrate in paragraphs below and in the attached Exhibits C – E, the fundamental premises to

7 these conclusions of the Internal Revenue Service (*i.e.*, that SSIF was a sham and that its

8 activities lacked economic substance), are demonstrably incorrect.

9       18.    <u>Memorandum Items:  Capital Account Year End Balances</u>.  In the FPAA, the

10 Internal Revenue Service adjusted the year-end capital accounts of each of SSIF's partners to $0,

11 using the same faulty rationale it used to disregard all the genuine business activities of SSIF

12 (primarily that SSIF was a sham and the partnership should be disregarded).  In fact, as

13 Petitioners conclusively demonstrate in paragraphs below and in the attached Exhibits C – E, the

14 fundamental premises to these conclusions of the Internal Revenue Service (*i.e.*, that SSIF was a

15 sham and that its activities lacked economic substance), are demonstrably incorrect.

16       19.    <u>Memorandum Items:  Partnership Item Components of Partners' Basis</u>.  In the

17 FPAA, the Internal Revenue Service adjusted various components making up each partner's

18 basis in its interest in SSIF by incorrectly concluding:

19       (a) The $501,300,000 in cash contributed to SSIF by partners Humptulips,

20       Satsop, Wynoochee, Chehalis, and Newaukum was not, in fact, proceeds from premium

21       loans from Deutsche Bank to Humptulips, Satsop, Wynoochee, Chehalis, and Newaukum

22       (disregarding the Deutsche Bank loans to Humptulips, Satsop, Wynoochee, Chehalis, and

23       Newaukum entirely and deeming the $501,300,000 as borrowed by SSIF from Deutsche

24       Bank);

25       (b) In the event the loans from Deutsche Bank to Humptulips, Satsop,

26       Wynoochee, Chehalis, and Newaukum are deemed to exist, the premium nature of the

27       loans should be disregarded, Humptulips, Satsop, Wynoochee, Chehalis, and

28       Newaukum's total obligation of repayment to Deutsche Bank should be deemed to be in

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SILICON VALLEY

11

PETITION FOR READJUSTMENT OF
PARTNERSHIP ITEMS UNDER INTERNAL
REVENUE CODE SECTION 6226

1    the amount of $501,300,000, and SSIF's assumption of the liability of the Humptulips,

2    Satsop, Wynoochee, Chehalis, and Newaukum notes should be deemed to be in the

3    amount of $501,300,000;

4        (c)  The total amount of the cash proceeds from the Deutsche Bank premium

5    loans should be integrated with a subsequent interest rate swap made by SSIF to create a

6    "synthetic debt instrument" such that the total principal amount of the notes assumed by

7    SSIF from Humptulips, Satsop, Wynoochee, Chehalis, and Newaukum be deemed to be

8    $501,300,000;

9        (d)  In the event the premium nature of the loans is respected under Internal

10   Revenue Code Section 752, the premium nature of the loans should be disregarded under

11   a temporary provision of the Treasury Regulations, and SSIF's assumption of the liability

12   of the Humptulips, Satsop, Wynoochee, Chehalis, and Newaukum notes should be

13   deemed to be in the amount of $501,300,000;

14       (e)  SSIF was a sham, the transactions in which SSIF and its members engaged

15   lacked economic substance, and the principal purpose of SSIF was to reduce the various

16   partners' federal tax liabilities;

17       (f)  SSIF should be disregarded as an entity, and the assets and activities of SSIF

18   should be deemed those of the partners;

19       (g)  Presidio Growth, Presidio Resources, Humptulips, Satsop, Wynoochee,

20   Chehalis, and Newaukum should not have been treated as partners of SSIF; and

21       (h)  The methods of accounting used by SSIF and its partners should be adjusted

22   so that the claimed increase in the partners' outside basis attributable to the premiums

23   from the Deutsche Bank loans contributed to SSIF be disallowed.

24   In fact, as Petitioners conclusively demonstrate in paragraphs below and in the attached Exhibits

25   C – E, the fundamental premises to these conclusions of the Internal Revenue Service (*i.e.*, that

26   the true nature of the premium loans made to Humptulips, Satsop, Wynoochee, Chehalis, and

27   Newaukum should be disregarded, that SSIF was a sham and that its activities lacked economic

28   substance), are demonstrably incorrect.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SILICON VALLEY

12

PETITION FOR READJUSTMENT OF
PARTNERSHIP ITEMS UNDER INTERNAL
REVENUE CODE SECTION 6226

20.     <u>Memorandum Items:  Partnership Item Components of At Risk Balances</u>.  In the FPAA, the Internal Revenue Service erroneously adjusted the "at risk" balances of each of the partners of SSIF to $0, by concluding:

(a)  SSIF was a sham, the transactions in which SSIF and its members engaged lacked economic substance, and the principal purpose of SSIF was to reduce the various partners' federal tax liabilities;

(b)  SSIF should be disregarded as an entity, and the assets and activities of SSIF should be deemed those of the partners;

(c)  Presidio Growth, Presidio Resources, Humptulips, Satsop, Wynoochee, Chehalis, and Newaukum should not have been treated as partners of SSIF;

(d)  The methods of accounting used by SSIF and its partners should be adjusted so that the expenses of SSIF are deemed those of the various partners;

(e)  SSIF failed to establish the amount of recourse liabilities and failed to establish the partnership items making up each partner's year-end at risk balance; and

(f)  Neither SSIF nor Humptulips, Satsop, Wynoochee, Chehalis, and Newaukum were at risk for the loans made to Humptulips, Satsop, Wynoochee, Chehalis, and Newaukum and assumed by SSIF.

In fact, as Petitioners conclusively demonstrate in paragraphs below and in the attached Exhibits C – E, the fundamental premises to these conclusions of the Internal Revenue Service (*i.e.,* that SSIF was a sham and that its activities lacked economic substance), are demonstrably incorrect.

21.     <u>Accuracy Related Penalties</u>.  In the FPAA, the Internal Revenue Service determined erroneously that three different types of penalties should be assessed:  a gross valuation misstatement penalty (for supposedly misstating the interest and basis of the stock distributed to the partners of SSIF); a negligence penalty; and substantial understatement penalty (based on the assertions that SSIF was a tax shelter, that "there was no substantial authority . . . for the position[s] taken" and that SSIF had "no reasonable belief upon the filing of the return that the position[s] taken [were] more likely than not the correct treatment of the transaction[s].") In light of the opinions received by SSIF's partners from two highly respected law and

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SILICON VALLEY

13

PETITION FOR READJUSTMENT OF
PARTNERSHIP ITEMS UNDER INTERNAL
REVENUE CODE SECTION 6226

1   accounting firms (examples of which are attached hereto as Exhibits D and E), the assessment of

2   penalties is wildly inappropriate.

3   <center>SUMMARY OF ERRORS IN FPAA</center>

4   A.      SSIF Was Not a Sham and the Premium Loans Were Genuine.

5          22.     As stated several times above, the fundamental premises to the conclusions of the

6   Internal Revenue Service in the FPAA were (a) SSIF was a sham and its activities lacked

7   economic substance, and (b) the premium loans made to Humptulips, Satsop, Wynoochee,

8   Chehalis, and Newaukum should be disregarded under a variety of theories.  In fact, the

9   investment program designed by Presidio Growth and implemented by SSIF, including *inter alia*

10  the rationale underlying the premium loan structure and the following interest rate swap

11  transaction, is described in the Confidential Memorandum attached hereto as Exhibit C.  The

12  Confidential Memorandum's description of the investment program and its strategy for

13  potentially making substantial profits for the partners of SSIF, is fully incorporated by reference

14  and fully supports Petitioners' assertions that the Respondent was in error when it concluded that

15  SSIF was a sham and the premium loans were a device that should be ignored or integrated with

16  the subsequent interest swap to create a "synthetic debt instrument."  Petitioners rely without

17  hesitation on the description of the investment program and its financial concomitants as proof of

18  the legitimacy and *bona fides* of SSIF and the tax return filed for the taxable year ended

19  December 22, 1999.

20         23.     Attached hereto as Exhibit D is an exhaustive 84 page, single-spaced, legal

21  opinion from the law firm of Brown & Wood LLP, a highly regarded New York firm that is

22  well-known for its expertise in complex tax matters.  The attached Brown & Wood "more likely

23  than not" legal opinion was rendered to Humptulips with respect to the activities engaged in by

24  SSIF and its partners, including Humptulips, relating to the tax year ended December 22, 1999

25  and addressed completely the appropriateness and correctness of the positions taken in the 1999

26  tax return filed by SSIF.  Similar opinions were rendered to Satsop, Wynoochee, Chehalis, and

27  Newaukum.  In the opinions rendered to each of these investors, Brown & Wood opined:

28         1.      Investor [Humptulips, Satsop, Wynoochee, Chehalis, and Newaukum] will

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SILICON VALLEY

14

PETITION FOR READJUSTMENT OF
PARTNERSHIP ITEMS UNDER INTERNAL
REVENUE CODE SECTION 6226

1    recognize no gain or loss upon receipt of the Loan proceeds, including the

2    Premium, which represents an amount to be amortized under Treas. Reg. §1.163-

3    13 against the issuer's interest expense over the life of the Loan;

4    2.   The Commissioner of Internal Revenue will have no authority under Treas. Reg.

5         §1.1275-6(c)(2) to integrate the fixed rate debt instrument and the interest rate

6         swap;

7    3.   Investor will recognize no gain or loss with respect to its capital contribution of

8         the Loan proceeds, including the premium, and other property to Partnership

9         subject to the Loan; and the amount of liability to be taken into account under

10        Code Section 752 with respect to the Loan is the principal amount of the Loan;

11   4.   Investor's basis in its interest in the Partnership will be equal to Investor's basis in

12        the contributed property, reduced by the principal amount of the loan to which the

13        contributed property was subject, and increased by Investor's share thereof;

14   5.   Upon redemption of Investor's interest in the Fund, Investor's adjusted basis in its

15        Fund interest immediately before such distribution, reduced by the amount of any

16        money distributed to Investor in the redemption, will be allocated to the financial

17        instruments distributed to Investor in the redemption; and

18   6.   Any loss recognized by the Investor upon the disposition of financial instruments

19        distributed to Investor in the redemption will be characterized as a capital loss,

20        and any loss recognized by Investor upon the disposition of foreign currency

21        distributed to Investor in the redemption will be characterized as an ordinary loss.

22   Throughout the legal opinion, Brown & Wood exhaustively treated, and rebutted, virtually every

23   argument now made by Respondent in the FPAA in dispute. Petitioners, who had no reason to

24   doubt the correctness of the Brown & Wood analysis in 1999, incorporate by reference herein the

25   entire Brown & Wood opinion and rely without hesitation on the opinion's assessment of the

26   investment program, its financial concomitants, and the appropriateness of the positions taken by

27   SSIF in the tax return filed for the tax year ended December 22, 1999.

28   24.   Attached hereto as Exhibit E is an exhaustive 106 page, single-spaced opinion

LATHAM•WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SILICON VALLEY

15

PETITION FOR READJUSTMENT OF
PARTNERSHIP ITEMS UNDER INTERNAL
REVENUE CODE SECTION 6226

1   from the accounting firm of KPMG, a highly regarded firm well-known for its expertise in

2   complex tax matters.  The attached KPMG "more likely than not" legal opinion was rendered to

3   Humptulips with respect to the activities engaged in by SSIF and its partners, including

4   Humptulips, relating to the tax year ended December 22, 1999 and addressed completely the

5   appropriateness and correctness of the positions taken in the 1999 tax return filed by SSIF.

6   Similar opinions were rendered to Satsop, Wynoochee, Chehalis, and Newaukum.  Specifically,

7   in the opinion rendered to Humptulips, KPMG opined:

8       •   The $89,000,000 loan premium will not constitute a liability of Investor

9          [Humptulips] or Partnership for purposes of Code Section 752, but represents an

10          addition to the $148,300,000 loan to be amortized under Treas. Reg. Section

11          1.163-13 against the issuer's interest expense over the life of the loan;

12       •   Investor will recognize no gain or loss upon receipt of the loan proceeds of

13          $148,300,000, including the loan premium of $89,000,000.

14       •   Investor will be recognized as the true borrower of the loan for U.S. federal

15          income tax purposes;

16       •   Investor will recognize no gain or loss with respect to its capital contribution of

17          $243,530,000 to Partnership subject to the $148,300,000 loan;

18       •   The fixed rate debt instrument and interest rate swap will not be integrated under

19          Treas. Reg. Section 1.1275-6(c)(2);

20       •   Upon liquidation of Investor's Partnership interest, Investor's adjusted basis of

21          $95,230,000, plus or minus its allocable share of Partnership income or loss, in its

22          Partnership interest is first reduced by actual cash received of $1,744,441 and the

23          residual amount is allocated to the foreign currency and financial instruments

24          distributed;

25       •   The difference between the basis allocated to the foreign currency received in a

26          liquidating distribution and the proceeds received upon disposition of such

27          currency will be deductable by Investor's sole member as an ordinary loss under

28          Code Sections 165(a) and 988(a);

LATHAM&WATKINS™
ATTORNEYS A' LAW
SILICON VALLEY

16

PETITION FOR READJUSTMENT OF
PARTNERSHIP ITEMS UNDER INTERNAL
REVENUE CODE SECTION 6226

- The difference between the basis allocated to the financial instruments received in a liquidating distribution and the proceeds received upon disposition of such financial instruments will be deductable by Investor's sole member as a capital loss under Code Section 165(a) subject to Code Section 165(f) which provides that losses from sales or exchanges of capital assets are allowed only to the extent allowed in Code Sections 1211 and 1212;
- Investor's sole member's Code Section 465 "at risk" amount for its taxable year ending on December 31, 1999, includes the cash and the adjusted basis of the assets distributed to Investor as liquidating distributions by Partnership;
- Partnership income (or loss) and the loss upon disposition of the assets received by Investor upon liquidation of its interest in Partnership will not be subject to limitation under the Code Section 469 passive activity loss rules;
- Investor's issuance of the debt instrument will not have a substantial effect on Investor's U.S. federal income tax liability that could be construed as unreasonable in light of the purposes of Code Sections 163(e), 1271 through 1275, or 701-777.

In the opinion rendered to Satsop, KPMG opined:

- The $34,000,000 loan premium will not constitute a liability of Investor [Satsop] or Partnership for purposes of Code Section 752, but represents an addition to the $56,700,000 loan to be amortized under Treas. Reg. Section 1.163-13 against the issuer's interest expense over the life of the loan;
- Investor will recognize no gain or loss upon receipt of the loan proceeds of $56,700,000, including the loan premium of $34,000,000.
- Investor will be recognized as the true borrower of the loan for U.S. federal income tax purposes;
- Investor will recognize no gain or loss with respect to its capital contribution of $93,080,000 to Partnership subject to the $56,700,000 loan;
- The fixed rate debt instrument and interest rate swap will not be integrated under

1    Treas. Reg. Section 1.1275-6(c)(2);

2    •    Upon liquidation of Investor's Partnership interest, Investor's adjusted basis of

3         $36,380,000, plus or minus its allocable share of Partnership income or loss, in its

4         Partnership interest is first reduced by actual cash received of $666,053 and the

5         residual amount is allocated to the foreign currency and financial instruments

6         distributed;

7    •    The difference between the basis allocated to the foreign currency received in a

8         liquidating distribution and the proceeds received upon disposition of such

9         currency will be deductible by Investor's sole member as an ordinary loss under

10        Code Sections 165(a) and 988(a);

11   •    Investor's sole member's Code Section 465 "at risk" amount for its taxable year

12        ending on December 31, 1999, includes the cash and the adjusted basis of the

13        assets distributed to Investor as liquidating distributions by Partnership;

14   •    Partnership income (or loss) and the loss upon disposition of the assets received

15        by Investor upon liquidation of its interest in Partnership will not be subject to

16        limitation under the Code Section 469 passive activity loss rules;

17   •    Investor's issuance of the debt instrument will not have a substantial effect on

18        Investor's U.S. federal income tax liability that could be construed as

19        unreasonable in light of the purposes of Code Sections 163(e), 1271 through

20        1275, or 701-777.

21   In the opinion rendered to Wynoochee, KPMG opined:

22   •    The $23,000,000 loan premium will not constitute a liability of Investor

23        [Wynoochee] or Partnership for purposes of Code Section 752, but represents an

24        addition to the $38,300,000 loan to be amortized under Treas. Reg. Section 1.163-

25        13 against the issuer's interest expense over the life of the loan;

26   •    Investor will recognize no gain or loss upon receipt of the loan proceeds of

27        $38,300,000, including the loan premium of $23,000,000.

28   •    Investor will be recognized as the true borrower of the loan for U.S. federal

LATHAM•WATKINS
ATTORNEYS AT LAW
SILICON VALLEY

18

PETITION FOR READJUSTMENT OF
PARTNERSHIP ITEMS UNDER INTERNAL
REVENUE CODE SECTION 6226

income tax purposes;

- Investor will recognize no gain or loss with respect to its capital contribution of $62,910,000 to Partnership subject to the $38,300,000 loan;

- The fixed rate debt instrument and interest rate swap will not be integrated under Treas. Reg. Section 1.1275-6(c)(2);

- Upon liquidation of Investor's Partnership interest, Investor's adjusted basis of $24,610,000, plus or minus its allocable share of Partnership income or loss, in its Partnership interest is first reduced by actual cash received of $451,405 and the residual amount is allocated to the foreign currency and financial instruments distributed;

- The difference between the basis allocated to the foreign currency received in a liquidating distribution and the proceeds received upon disposition of such currency will be deductible by Investor's sole member as an ordinary loss under Code Sections 165(a) and 988(a);

- The difference between the basis allocated to the financial instruments received in a liquidating distribution and the proceeds received upon disposition of such financial instruments will be deductible by Investor's sole member as a capital loss under Code Section 165(a) subject to Code Section 165(f) which provides that losses from sales or exchanges of capital assets are allowed only to the extent allowed in Code Sections 1211 and 1212;

- Investor's sole member's Code Section 465 "at risk" amount for its taxable year ending on December 31, 1999, includes the cash and the adjusted basis of the assets distributed to Investor as liquidating distributions by Partnership;

- Partnership income (or loss) and the loss upon disposition of the assets received by Investor upon liquidation of its interest in Partnership will not be subject to limitation under the Code Section 469 passive activity loss rules;

- Investor's issuance of the debt instrument will not have a substantial effect on Investor's U.S. federal income tax liability that could be construed as

LATHAM&WATKINS
ATTORNEYS AT LAW
SILICON VALLEY

19

PETITION FOR READJUSTMENT OF
PARTNERSHIP ITEMS UNDER INTERNAL
REVENUE CODE SECTION 6226

1    unreasonable in light of the purposes of Code Sections 163(e), 1271 through
2    1275, or 701-777.

3    In the opinion rendered to Chehalis, KPMG opined:

4    • The $22,000,000 loan premium will not constitute a liability of Investor
5      [Chehalis] or Partnership for purposes of Code Section 752, but represents an
6      addition to the $36,700,000 loan to be amortized under Treas. Reg. Section 1.163-
7      13 against the issuer's interest expense over the life of the loan;

8    • Investor will recognize no gain or loss upon receipt of the loan proceeds of
9      $36,700,000, including the loan premium of $22,000,000.

10   • Investor will be recognized as the true borrower of the loan for U.S. federal
11     income tax purposes;

12   • Investor will recognize no gain or loss with respect to its capital contribution of
13     $60,240,000 to Partnership subject to the $36,700,000 loan;

14   • The fixed rate debt instrument and interest rate swap will not be integrated under
15     Treas. Reg. Section 1.1275-6(c)(2);

16   • Upon liquidation of Investor's Partnership interest, Investor's adjusted basis of
17     $23,540,000, plus or minus its allocable share of Partnership income or loss, in its
18     Partnership interest is first reduced by actual cash received of $427,920 and the
19     residual amount is allocated to the foreign currency and financial instruments
20     distributed;

21   • The difference between the basis allocated to the foreign currency received in a
22     liquidating distribution and the proceeds received upon disposition of such
23     currency will be deductible by Investor's sole member as an ordinary loss under
24     Code Sections 165(a) and 988(a);

25   • The difference between the basis allocated to the financial instruments received in
26     a liquidating distribution and the proceeds received upon disposition of such
27     financial instruments will be deductible by Investor's sole member as a capital
28     loss under Code Section 165(a) subject to Code Section 165(f) which provides

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

20

PETITION FOR READJUSTMENT OF
PARTNERSHIP ITEMS UNDER INTERNAL
REVENUE CODE SECTION 6226

1    that losses from sales or exchanges of capital assets are allowed only to the extent

2    allowed in Code Sections 1211 and 1212;

3    • Investor's sole member's Code Section 465 "at risk" amount for its taxable year

4    ending on December 31, 1999, includes the cash and the adjusted basis of the

5    assets distributed to Investor as liquidating distributions by Partnership;

6    • Partnership income (or loss) and the loss upon disposition of the assets received

7    by Investor upon liquidation of its interest in Partnership will not be subject to

8    limitation under the Code Section 469 passive activity loss rules;

9    • Investor's issuance of the debt instrument will not have a substantial effect on

10   Investor's U.S. federal income tax liability that could be construed as

11   unreasonable in light of the purposes of Code Sections 163(e), 1271 through

12   1275, or 701-777.

13   In the opinion rendered to Newaukum, KPMG opined:

14   • The $20,000,000 loan premium will not constitute a liability of Investor

15   [Newaukum] or Partnership for purposes of Code Section 752, but represents an

16   addition to the $33,300,000 loan to be amortized under Treas. Reg. Section 1.163-

17   13 against the issuer's interest expense over the life of the loan;

18   • Investor will recognize no gain or loss upon receipt of the loan proceeds of

19   $33,300,000, including the loan premium of $20,000,000.

20   • Investor will be recognized as the true borrower of the loan for U.S. federal

21   income tax purposes;

22   • Investor will recognize no gain or loss with respect to its capital contribution of

23   $54,700,000 to Partnership subject to the $33,300,000 loan;

24   • The fixed rate debt instrument and interest rate swap will not be integrated under

25   Treas. Reg. Section 1.1275-6(c)(2);

26   • Upon liquidation of Investor's Partnership interest, Investor's adjusted basis of

27   $21,400,000 , plus or minus its allocable share of Partnership income or loss, in

28   its Partnership interest is first reduced by actual cash received of $395,050 and the

LATHAM&WATKINS^LP
ATTORNEYS AT LAW
SILICON VALLEY

21

PETITION FOR READJUSTMENT OF
PARTNERSHIP ITEMS UNDER INTERNAL
REVENUE CODE SECTION 6226

1  residual amount is allocated to the foreign currency and financial instruments
2  distributed;
3  • The difference between the basis allocated to the foreign currency received in a
4  liquidating distribution and the proceeds received upon disposition of such
5  currency will be deductible by Investor's sole member as an ordinary loss under
6  Code Sections 165(a) and 988(a);
7  • The difference between the basis allocated to the financial instruments received in
8  a liquidating distribution and the proceeds received upon disposition of such
9  financial instruments will be deductible by Investor's sole member as a capital
10  loss under Code Section 165(a) subject to Code Section 165(f) which provides
11  that losses from sales or exchanges of capital assets are allowed only to the extent
12  allowed in Code Sections 1211 and 1212;
13  • Investor's sole member's Code Section 465 "at risk" amount for its taxable year
14  ending on December 31, 1999, includes the cash and the adjusted basis of the
15  assets distributed to Investor as liquidating distributions by Partnership;
16  • Partnership income (or loss) and the loss upon disposition of the assets received
17  by Investor upon liquidation of its interest in Partnership will not be subject to
18  limitation under the Code Section 469 passive activity loss rules;
19  • Investor's issuance of the debt instrument will not have a substantial effect on
20  Investor's U.S. federal income tax liability that could be construed as
21  unreasonable in light of the purposes of Code Sections 163(e), 1271 through
22  1275, or 701-777.
23  Throughout its opinions, KPMG exhaustively treated, and rebutted, virtually every argument
24  now made by Respondent in the FPAA in dispute. Petitioners, who had no reason to doubt the
25  correctness of the KPMG analysis in 1999, incorporate by reference herein the entire KPMG
26  opinions and rely without hesitation on the opinions' assessment of the investment program, its
27  financial concomitants, and the appropriateness of the positions taken by SSIF in the tax return
28  filed for the tax year ended December 22, 1999.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SILICON VALLEY

22

PETITION FOR READJUSTMENT OF
PARTNERSHIP ITEMS UNDER INTERNAL
REVENUE CODE SECTION 6226

1   25.    As described in Exhibit C, SSIF was established by Presidio Growth as part of an

2   investment pool that sought to provide investors with a high total return on their leveraged

3   investment.  To obtain this objective, SSIF was to invest in U.S. dollar and foreign currency

4   denominated debt securities of corporate and governmental issuers and enter into forward foreign

5   currency exchange contracts, options on currencies and securities and other investments selected

6   by Presidio Growth, as Managing Member of SSIF.

7   26.    As described more completely in Exhibit C, an important part of SSIF's

8   investment program were potential investments which had the effect of shorting so-called

9   "pegged" foreign currencies.  Starting in the late 1980's, many emerging market governments

10  decided to "peg" or fix their country's currency to the U.S. dollar.  One of the reasons behind

11  this step was that inflation, and sometimes hyper-inflation, was a chronic problem in the

12  developing world, and fixing a currency's value to the U.S. dollar typically provided a dramatic

13  and rapid cure to inflationary pressures.   The ultimate effect of pegging a foreign currency to the

14  U.S. dollar was that the local authorities, in effect, lost the ability to "print money" at will, and

15  turned the local economy's money supply over to the U.S. Federal Reserve.  In addition,

16  currency pegs were seen as a way to attract foreign investment because foreign currency risk

17  would be eliminated as an investment issue if the foreign currency were securely pegged to the

18  value of the U.S. dollar.

19  27.    By 1994, problems caused by currency pegs became evident.  In that year,

20  Mexico was forced to break its peg, and its currency quickly lost approximately 45% of its value

21  versus the dollar.  A year later, Venezuela had a similar experience when it was forced to break

22  its peg and the currency lost approximately 35% of its value.  The reasons behind these dramatic

23  devaluations were these:  When an emerging market nation creates a currency peg, it is not long

24  before investment banks and hedge funds decide that it is advantageous to borrow funds in the

25  currency of the developed country to which the foreign currency is pegged (e.g., the U.S. dollar)

26  and lend the funds in the local currency (e.g., the Mexican peso).  Since interest rates in the

27  emerging market countries are always higher than U.S. dollar rates, the investment banks and

28  hedge funds found they could profit on the spread between the interest earned on the foreign

LATHAM•WATKINS™
ATTORNEYS AT LAW
SILICON VALLEY

23

PETITION FOR READJUSTMENT OF
PARTNERSHIP ITEMS UNDER INTERNAL
REVENUE CODE SECTION 6226

1   loans (which were typically in the form of bonds issued by the emerging market countries) and

2   the interest paid on the U.S. loan. This strategy (*i.e.,* earning revenue from the difference in the

3   amount of interest received versus the amount of interest paid) only works as long as the peg

4   remains in place. The profits that the investment banks and hedge funds make from this strategy

5   stop when the emerging market government runs out of cash to pay interest on its obligations

6   (typically bonds denominated in the foreign currency). At that point, the foreign currency peg

7   can no longer be maintained and a devaluation occurs.

8       28.     Devaluations of this type were not uncommon, occurring, in chronological order,

9   in Mexico, Venezuela, Thailand, Malaysia, Korea, Indonesia, Russia, Brazil, and eventually

10  Argentina. SSIF's investment plan was designed to realize profit on investments when pegged

11  foreign currencies were devalued, or when they came close to being devalued. The basic

12  concept behind the investment plan (setting aside all the mechanics of implementation) was to

13  agree to exchange a foreign currency for U.S. currency at a predetermined rate of exchange at a

14  particular date in the future (*e.g.,* a trader agrees that seven months in the future, he will give

15  another trader 2000 pesos in exchange for $1000). In this example, if the peso devalued in the

16  seven-month period, the first trader would be able to buy pesos to cover his 2000 peso obligation

17  at considerably less than $1000. So, at the seven month point, the first trader might be able to

18  spend, say, $500 to buy 2000 pesos, and then exchange the 2000 pesos for $1000 – a substantial

19  profit ($500) earned.

20      29.     As described in Exhibit C, in the early stages of SSIF's investment program, there

21  were several scenarios in which an investor could realize a substantial profit in the investments

22  relating to pegged currencies. First, there could be a devaluation of the underlying currency (the

23  Argentine Peso or the Hong Kong dollar, for example) versus the dollar. If, for example, the

24  Argentine peso had devalued in 1999 (rather than in 2001), SSIF investors would have earned a

25  several hundred percent profit in the manner described in the previous example. Second, if there

26  was not an actual devaluation in Argentina, the value of the forward exchange contracts could

27  appreciate considerably if the international currency market began to anticipate a break in the

28  currency peg. Third, the second set of currency forwards traded (the Hong Kong dollar was also

LATHAM&WATKINS™
ATTORNEYS AT LAW
SILICON VALLEY

24

PETITION FOR READJUSTMENT OF
PARTNERSHIP ITEMS UNDER INTERNAL
REVENUE CODE SECTION 6226

1   sold short using currency forwards) could also experience a significant change in value.  While
2   SSIF's advisors did not expect a change in value for the Hong Kong dollar to be as extreme as
3   the Argentine peso (Hong Kong had a more stable economy at that time), these were very
4   volatile times in the foreign currency and debt markets.  Given the fears of Y2K's pending effect
5   on the world-wide financial markets and the collapse of the Thai Bhat and the so-called Asian
6   Contagion that occurred only 24 months earlier, there was every reason to expect further turmoil
7   in these markets.

8       30.    Investors in SSIF, and SSIF itself, were highly leveraged through the use of
9   premium loans.  Presidio Growth recommended premium loans in order to lessen the financial
10  risks associated with participation in SSIF over a period of time.  The premium loans were, in
11  Presidio Growth's view, an integral part of the economics of the proposed investment strategy.

12      31.    A premium loan bears an above-market rate of interest with respect to the
13  principal amount of the loan.  Because the loan bears an above-market rate of interest, the
14  amount of proceeds delivered by the lender to the borrower at the closing of the loan actually
15  exceeds the amount of the principal of the loan.  The amount delivered by the lender to the
16  borrower at the closing of the loan that exceeds the principal of the loan is referred to as a "loan
17  premium."  Premium loans are used regularly in many sophisticated, international financial
18  investment transactions.

19      32.    Because SSIF's investments were so highly leveraged, SSIF employed various
20  tactics to minimize interest risk, and to capitalize on other inefficiencies in the world markets.
21  One strategy was to exchange the United States dollar loan proceeds into Euros using forward
22  exchange contracts.  This enhanced the yield on the cash collateral upward from the money-
23  market rate being paid by major banks on short-term deposits to the LIBOR rate.  In addition,
24  when combined with the interest rate swap (discussed below), the LIBOR-based return earned on
25  the Euro forward contracts addressed a particular form of "interest rate spread" risk (which was
26  one of the risks of holding a fixed rate loan).

27      33.    Another strategy involved entering into a fixed-for-floating interest rate swap
28  shortly after the Strategic Investment Fund ("SIF") received the loan proceeds from its investors.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SILICON VALLEY

25

PETITION FOR READJUSTMENT OF
PARTNERSHIP ITEMS UNDER INTERNAL
REVENUE CODE SECTION 6226

1   To mitigate its risk position with respect to interest rates changes during the term of the loans,

2   SSIF entered into a fixed-for-floating rate interest rate swap with major banks for a term of

3   approximately seven years. SSIF entered into the fixed-for-floating rate swap in order to hedge

4   interest rate risk. Interest rate risk is the risk that the value of a fixed income instrument will

5   decline in value if market rates change. Since the loans assigned to SSIF by Humptulips, Satsop,

6   Wynoochee, Chehalis, and Newaukum were fixed rate loans, SSIF's assumption of the loans

7   carried with it significant interest rate risk. If market rates had declined, the value of the loans

8   would have increased and, accordingly, the economic obligation under the loans would have

9   increased had the loans been prepaid. The fixed-for-floating interest rate swap mitigated that

10  risk by decreasing the risk on the seven year fixed-rate loans in a period of time when many

11  commentators were expecting increasing volatility in interest rates stemming from the expanding

12  world economy and the fiscal difficulties of many countries.

13      34.     Another feature of the premium loans was that they served as collateral for the

14  SSIF's foreign currency trades. Typically, investment banks require collateral equal to 5 to 10%

15  of the amount of a foreign currency trading position. This amount would be greater for smaller

16  customers or customers not well known to the bank. Currency trading as described above is an

17  institutional trade not open to retail customers of a bank. The investment bank held proceeds

18  from the loans as collateral for the Fund's trades so that, for the initial series of investments, no

19  further collateral was required to support the trading program.

20  B.     Each Item and Ground Advanced by Respondent for Readjustment is Unsubstantiated.

21      35.     The FPAA readjusts numerous items of SSIF's 1999 return and justifies its

22  adjustment with repetitive conclusory statements to the effect that SSIF was a sham, SSIF had no

23  economic purpose, the partnership should be completely disregarded, the premium loans made

24  by Deutsche Bank to Humptulips, Satsop, Wynoochee, Chehalis, and Newaukum and then

25  assigned to SSIF should be recast as floating rate loans (with no premium) made to SSIF, SSIF's

26  accounting should be disregarded, and so on. Where the FPAA is woefully deficient is that

27  Respondent does not even make the slightest attempt to explain *why* SSIF was a sham, or *why*

28  the premium loans should be so cavalierly disregarded. The FPAA is, in short, nothing more

LATHAM&WATKINS⌐
ATTORNEYS AT LAW
SILICON VALLEY

26

PETITION FOR READJUSTMENT OF
PARTNERSHIP ITEMS UNDER INTERNAL
REVENUE CODE SECTION 6226

1  than argument by assertion. The fact of the matter is that Exhibits C – E demonstrate very well

2  SSIF was not a sham, the premium loans were legitimate, and the 1999 tax return filed by SSIF

3  was legitimate as well.

4  C.      Penalties of Any Type Are Not Warranted.

5        36.    The Respondent claims the authority to impose penalties under Section 6662 of

6  the Internal Revenue Code. Penalties can only be imposed, however, if the Petitioners' positions

7  are incorrect. The Petitioners' positions, however, are correct. Even if the Petitioners' positions

8  were incorrect, the Petitioners would not be subject to penalties if there were a reasonable cause

9  for the positions they took. As Petitioners have explained above, their positions were supported

10  by two contemporaneously-prepared opinions of qualified tax counsel and accountants, and there

11  is nothing to suggest that Petitioners were anything other than justified in relying upon such

12  opinions.

13                            PRAYER FOR RELIEF

14        WHEREFORE, Petitioners pray for judgment against Respondent as follows:

15        1.    That Petitioners be refunded $109,000, together with interest as allowed by law;

16        2.    That Respondent's Final Partnership Administrative Adjustment (FPAA) be

17  adjudicated null and void, and such FPAA have no legal force and effect;

18        3.    That Petitioners are adjudicated not liable for the additions to tax for the

19  following accuracy related penalties: (a) gross valuation misstatement; (b) negligence; and (c)

20  substantial understatement, and that each such penalty not be imposed or sustained against the

21  plaintiffs;

22        4.    That Petitioners are entitled to recover costs and attorney's fees; and

23

24

25

26

27

28

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SILICON VALLEY

27

PETITION FOR READJUSTMENT OF
PARTNERSHIP ITEMS UNDER INTERNAL
REVENUE CODE SECTION 6226

1      5.      For such other, further, and different relief as the Court may deem proper under

2  the circumstances.

3

4  Dated: October _8_, 2004

5                                   LATHAM & WATKINS LLP

6

7                          By _David A. York /cb_
                                     David A. York

8                                   Attorneys for Petitioners
                                   SANFORD STRATEGIC INVESTMENT
                                 FUND LLC;  PRESIDIO GROWTH LLC

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SILICON VALLEY

28

PETITION FOR READJUSTMENT OF
PARTNERSHIP ITEMS UNDER INTERNAL
REVENUE CODE SECTION 6226